FRANCES CIECWIRZ, PETITIONER-RESPONDENT, v. PUBLIC SERVICE ELECTRIC AND GAS COMPANY, RESPONDENT-PROSECUTOR.

Argued October 8, 1941—Decided January 31, 1942.

Before Justices BODINE, PERSKIE and PORTER.

For the prosecutor, *Henry S. Fryling* (*William H. Speer* and *Vincent F. Vosseller,* of counsel).

For the respondent, *David Roskein* (*John A. Laird,* of counsel).

The opinion of the court was delivered by

PERSKIE, J. The question requiring decision in this workmen's compensation case is whether respondent's husband died as the result of an accident arising out of and in the course of his employment, as claimed and found for the respondent, or whether respondent's husband died as the result of a normal cause (acute heart failure) in nowise related to an accident, as claimed for prosecutor.

Anthony Ciecwirz, respondent's husband, concededly died of a heart condition, at the age of 58, on March 7th, 1938, while working as a laborer for prosecutor. He had been employed by prosecutor, in the stated capacity, since 1909. He never complained of poor health. On the contrary, he appeared to be enjoying good health. He was a good and regular worker and was a cheerful person.

On March 7th, 1938, a "clear," "very cold" and "freezing" day, Anthony Ciecwirz (hereafter referred to as Anthony), together with fellow workmen, was engaged in the work of digging a trench around prosecutor's main gas pipe line (hereafter referred to as pipe line) located at prosecutor's yard in Harrison, New Jersey, for the purpose of locating and repairing a leak which had developed in that pipe line. The digging was done with a pick and shovel. One workman, working at the bottom of the trench, would loosen the soil with his pick, and then shovel up the loosened soil to the top of the pipe line. Another workman would then remove the soil so deposited on the pipe line to the surface of the ground. Because of the leakage of the gas, the workmen would alternate their respective positions in the trench at intervals, variously estimated, ranging between three and thirty minutes.

Between 10:00 and 11:00 A. M., on March 7th, 1938, the digging of the trench had progressed to a point where it was about eight feet deep and about four feet wide, and the distance from the bottom of the trench to the top of the pipe line where the soil was first deposited was about four feet. At the time stated, Anthony was working at the bottom of the trench and Fred Hoffstadt was working on top of the pipe line. As both were so working, Hoffstadt heard Anthony

make some exclamation ("oh, boy"), and saw Anthony collapse and fall face downward on the bottom of the trench, the shovel underneath him.

Hoffstadt promptly got down to Anthony. He "shook him" but got no answer. He turned Anthony around and saw that his face was "strained" and that he was "breathing heavily." Hoffstadt with the help of another workman (Thomas McGeachen) then took Anthony, who remained unconscious, out of the trench. Hoffstadt called the foreman and both erroneously believing that Anthony had been overtaken by the gas fumes, the foreman instructed Hoffstadt to get the artificial respirator. As Hoffstadt was running to carry out instructions, he heard some one say "it's all right." He immediately returned to the place where Anthony, lying on a plank which had been placed on the ground, was being subjected to artificial respiration. Hoffstadt testified that Anthony's appearance was "very funny" and that "the man [Anthony] started to turn blue, blue is the color he turned."

Dr. John Pavio, employed by prosecutor, apparently was the first physician on the scene. He said he got there between 10:00 and 10:30 o'clock and that Anthony had already been pronounced dead although there is nothing to indicate who made that pronouncement. At all events, Dr. Pavio examined Anthony and gave him an injection of "choramid" without avail. The sergeant of the local police department came to the scene at 12:15 P. M., in response to a call that a man had been overcome by gas. With the permission of the doctor the prone method of respiration, which was in progress, was continued. Anthony never regained consciousness and at 12:15 or 12:30 P. M., was again pronounced dead by Dr. Pavio, but the artificial respiration was continued for several hours thereafter. The death certificate states that the cause of death is "syncope, due to cardiac disease, probably myocardial in nature * * *." No autopsy was performed. A blood test was made for the purpose of determining whether there was sufficient carbon monoxide gas in the system to cause death and the result was in the negative.

In the Workmen's Compensation Bureau it was determined that Anthony was engaged in "laborious work" particularly

for a man of his age and that the "exertion of the work superimposed upon his existing heart condition brought about his death at the time and place at which it occurred, and * * * accordingly he died as the result of an accident within the meaning of the Workmen's Compensation Act." Compare *Bernstein Furniture Co.* v. *Kelly,* 114 *N. J. L.* 500; 177 *Atl. Rep.* 554; *affirmed,* 115 *N. J. L.* 500; 180 *Atl. Rep.* 832; *Hentz* v. *Janssen Dairy Corp.,* 122 *N. J. L.* 494; 6 *Atl. Rep.* (2*d*) 409; *Azarowicz* v. *Metropolitan Beef Co.,* 118 *N. J. L.* 89; 191 *Atl. Rep.* 683. Additionally it was determined in the Bureau that Anthony's employment was one of the contributing causes without which the accident would not have happened and that the accident was one of the contributing causes without which the injury or death would not have resulted (*Ciocca* v. *National Sugar Refining Co.,* 124 *N. J. L.* 329; 12 *Atl. Rep.* (2*d*) 130), and that prosecutor had knowledge of the accident on the day of its occurrence.

On appeal to the Hudson County Court of Common Pleas, that court affirmed the Bureau. A writ of *certiorari* was allowed prosecutor.

The gravamen of prosecutor's argument here, as it was below, is that respondent failed to establish by "a preponderance of probabilities" (*Gilbert* v. *Gilbert Machine Works, Inc.,* 122 *N. J. L.* 533, 538; 6 *Atl. Rep.* (2*d*) 213; *Calicchio* v. *Jersey City Stock Yards Co.,* 125 *N. J. L.* 112; 14 *Atl. Rep.* (2*d*) 465; *Pierce* v. *Jersey Central Power and Light Co.,* 127 *N. J. L.* 71, 73; 21 *Atl. Rep.* (2*d*) 311) that the employment was one of the contributing causes without which the death of respondent's husband would not have happened. *Bollinger* v. *Wagaraw Building Supply Co.,* 122 *N. J. L.* 512, 520; 6 *Atl. Rep.* (2*d*) 396, 401; *Ciocca* v. *National Sugar Refining Co., supra; Molnar* v. *American Smelting Co.,* 127 *N. J. L.* 118, 120; 21 *Atl. Rep.* (2*d*) 213, 214; 128 *N. J. L.* 11; 24 *Atl. Rep.* (2*d*) 392. That argument is based on the premise that the probabilities were as consistent "with sudden death overtaking decedent at any time or any place, and (the fact) that (death) did happen while (Anthony) was at work, on his job, was merely coincidental."

The preponderance of probabilities do not, in our opinion, support the argument made.

The expert medical testimony is, as usual, in conflict. It is altogether clear that Anthony did not die as the result of carbon monoxide poisoning. For had he so died, the appearance of his body would have been, as testified to by Assistant County Physician Dr. Hernandez, "a cherry-red-pink-cherry red pink" instead of blue. There is no dispute on this score. It is equally clear that Anthony died of a heart condition and that his having been subjected to artificial respiration completely removed whatever chance, if any, he had to survive.

Drs. Sutton, Pascall and Pavio, employed by prosecutor, testified for it. A general statement of the substance of their testimony will suffice. Drs. Sutton and Pascall were of the opinion that death was due to a "sudden" and "acute cardiac condition." Dr. Pavio was of the opinion that death was due to a "myocardial insufficiency." The three doctors were of the opinion that there was no causal relationship between Anthony's work and his death and that his death was not the result of any exertion which his work superimposed upon a pre-existing heart condition. Drs. Sutton and Pavio were further of the opinion that Anthony's death could have occurred from causes free from exertion, for examples, while he "slept," while "turning in bed," while "sitting in" or "getting out" of a chair, or while "reading a newspaper." Thus prosecutor contends that "whatever this man had been doing at the time of the seizure the end result would have been the same."

If death could have happened under the suppositious circumstances it could likewise have happened, as it did, while Anthony was engaged in the laborious and strenuous work of shoveling up soil. Dr. Sutton so admitted although Dr. Pascall was unwilling to "go quite so far." Dr. Pavio concedes that "rest" and not "heavy laborious work" is the proper treatment for one who as Anthony, according to the doctor's opinion, suffered from "myocardial insufficiency."

We need hardly labor the point that we are not primarily concerned with suppositious circumstances under which

Anthony could have died. Our primary concern is solely whether, under the circumstances here exhibited, respondent had properly established, by "a preponderance of probabilities," her claimed right to compensation.

Drs. Yaguda and Olcott testified for respondent. Here again we shall make but brief reference to the substance of their testimony.

Dr. Yaguda was of the opinion that Anthony was afflicted with a heart condition although it was not discovered until after his death, a not uncommon experience. He was strongly of the opinion that men who have normal hearts do not die of "heart deaths" without a pre-existing heart condition unless there is a direct traumatic injury to the heart such as a "bullet through the heart," or a "crushing wound tearing the heart," or the like. In his opinion the laborious work done by Anthony at the time of his attack, the suddenness with which death followed, the fact that when Anthony was taken out of the trench he was "cyanotic" or "blue" rather than "ashen" in color, which would have been his color had he been stricken with a sudden attack of "acute coronary occlusion," as claimed by prosecutor, the elimination, by clearly distinguishable symptoms, of all other probable causes of death, all established that the "effort" expended by Anthony, as distinguished by the doctor from an "extra strain," "brought on acute heart failure" and that, therefore, there was a "causal relationship" between the work Anthony was doing at the time and his death.

Dr. Olcott testified that, in his opinion, under all the circumstances exhibited, "the exertion of the work precipitated the final catastrophe of a pre-existing heart;" and "that (the work of shoveling up of the soil) was the final precipitating cause of the heart failure, the exertion of the moment."

However the work Anthony was doing be characterized, whether it be as "effort expended" or "extra strain" or "exertion of the moment," so long as there was, as here, a "causal relationship" between his work (shoveling up of soil from a deep trench in an atmosphere of escaping gas) and his death, then his death was the result of an accident arising out of

and in the course of his employment. *Cf. Molnar* v. *American Smelting Co.* (*Court of Errors and Appeals*), *supra.*

In fine, our careful consideration of the proofs adduced, and all proper inferences deducible therefrom, satisfies us, and we find, as did the two lower tribunals, that the respondent had properly established, factually and legally, her claimed right to compensation.

The writ is dismissed, with costs.